UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

PERFORMANCE CONTRACTING, INC.,
a foreign corporation,

        Plaintiff,                                      Case No. 12-10165
                                                        Honorable Thomas L. Ludington

v.

DYNASTEEL CORP., JAMES W. RUSSELL,
JR., and RONALD W. RUSSELL,

        Defendants.
_____/

**OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING
PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

This case presents one primary question: Must a non-Michigan building contractor comply with Michigan law concerning payment to its non-Michigan subcontractors because it was hired by a Michigan project owner? Plaintiff Performance Contracting, Inc. (PCI) believes it should. PCI brought suit against Defendants DynaSteel Corporation, James W. Russell, Jr., and Ronald W. Russell, in part, because they did not comply with Michigan law when they paid PCI for work on a Michigan construction project.

But the parties agreed, when they contracted with one-another, that Tennessee law would govern any disputes. Because of that fact — and because the Michigan law in question does not apply on its own accord — the answer is no. Defendants' motion for summary judgment on Count I will be granted and PCI's motion for summary judgment on Count I will be denied.

**I**

In 1970, James Russell started DynaSteel in Memphis, Tennessee. Over time, he built the company into a substantial operation with facilities in Tennessee and Mississippi. DynaSteel originally specialized in light dust and pollution control, but over time it expanded into

manufacturing ductwork, primarily for power plants.  After acquiring sole ownership in 1973, Jim Russell ran DynaSteel as Chief Executive Officer.  Eventually Jim's son, Ronald Russell, and his daughter, Lauren Powers, each acquired a 20% interest in DynaSteel, reducing Jim's ownership interest to 60%.

In July 2008, H.I.G. Capital (HIG) acquired a majority interest in DynaSteel, creating DS Steel Holdings, Inc. to take over the shares.  HIG, through DS Steel, then owned 75% of DynaSteel, while Jim retained a 15% ownership interest, and his two children 5% each.  DynaSteel, under this new ownership arrangement, carried on with business.

On October 30, 2008, DynaSteel entered into a contract with Consumers Energy, agreeing to furnish ductwork for a Consumers plant in Essexville, Michigan (the Karn Project).  DynaSteel was originally to be paid $7,710,000 for the work.  Under the contract, DynaSteel would fabricate ductwork for the Karn Project at its facility in Natchez, Mississippi, and then have the ductwork shipped to Michigan for installation.

Just over three months later, in February 2009, Consumers issued Project Change Notice (PCN) 053 to DynaSteel.  PCN 053 requested that DynaSteel design and install insulation and lagging on the ductwork to protect it during on-site storage while awaiting installation.  The total amount of the requested changes was $2,924,755, bringing the total DynaSteel would be paid for the project to $10,634,755.[1]  Two weeks later, on February 28, 2009, DynaSteel issued Purchase Order No. 08018051 (the Purchase Order) to PCI requesting that PCI supply and install the insulation and lagging that Consumers had requested.  The Purchase Order offered PCI $1,842,890 to perform as DynaSteel's subcontractor, and PCI signed its agreement on March 19, 2009.  This was not the first time PCI and DynaSteel worked together: PCI had done work for

---

[1] With the addition of change orders that are not germane to this lawsuit, DynaSteel was paid over $13 million for its work on the Karn Project.

DynaSteel on several other jobs, including a project in Ohio (the Sammis Project) and another in Maryland (the Brandon Shoes Project).

During 2009, Consumers began to pay DynaSteel for the work on the Karn Project. By October, DynaSteel had been paid the full amount of the insulation change-order contract, which was just over $2.9 million. R. Russell Dep. 152. In other words, Consumers had paid DynaSteel for all of the insulation and lagging work that had been done to prepare the ductwork for installation. That $2.9 million "certainly covered" the $1.8 million DynaSteel owed to PCI for its contributions. *Id*. When DynaSteel received payments from Consumers, it deposited the payments into a general business account at Fifth Third Bank, co-mingling the funds with other payments from other projects.

During the second half of 2009, DynaSteel fell behind on its payments to PCI for the two other pending projects — Sammis and Brandon Shores. Specifically, as of June 18, 2009, DynaSteel owed PCI $2,587,079.86 for its contributions to the Sammis Project and $749,675.20 for the Brandon Shores Project.

Nevertheless, PCI completed its work on the Karn Project by September 25, 2009. Despite having received over $2.9 million from Consumers for the insulation work by October 2009 — of which over $1.8 million was owed to PCI — DynaSteel made only one payment to PCI specifically earmarked for the Karn Project: a payment of $300,000 on September 29, 2009. The other $1,542,890 remained unpaid.

In order to deal with the unpaid invoices, representatives of the two parties met on several occasions and ultimately agreed upon a payment plan. Dated November 17, 2009, this agreement (the November Payment Agreement) required periodic payments from DynaSteel totaling $4,191,747 — the total amount DynaSteel still owed PCI for its work on the Karn,

Sammis, and Brandon Shores Projects.[2] The November Payment Agreement expressly required principal to be applied to "the oldest outstanding invoices first." Nov. Payment Agreement ¶ 9, Defs.' Mot. Ex. D, at 2.

DynaSteel made payments to PCI totaling over $2.1 million under the November Payment Agreement between November 2009 and June 10, 2010, leaving an unpaid principal balance of just under $2.1 million.[3]

On December 14, 2011, PCI filed suit in Bay County Circuit Court, State of Michigan. PCI alleged the following claims: violation of the Michigan Builders Trust Fund Act (MBTFA); Fraud/Fraud in the Inducement; Conspiracy to Defraud and/or Violate the Trust Fund Act; and Breach of Contract. Defendants removed the action to this Court on January 13, 2012. Subsequently, both parties have moved for summary judgment on Count I of PCI's complaint. Defendants assert that the MBTFA does not apply to this case as a matter of law; PCI asserts just the opposite.

## II

Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The focus must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52 (1986). All justifiable inferences from the evidence are drawn in the non-moving party's favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is proper where a plaintiff fails to produce evidence creating a

---

[2] Payments had continued on the Sammis and Brandon Shores projects since June, reducing the total DynaSteel owed for the three projects combined.

[3] There is a dispute as to how much principal DynaSteel still owes. Defendants contend the unpaid principal amounts to $2,078,058, Defs.' Mot. 2; while PCI asserts DynaSteel owes $2,091,747. Pl.'s Resp. 9. But for purposes of this summary judgment determination, this factual discrepancy need not be resolved.

genuine issue of material fact as to any of the essential elements of its prima facie case. *Dietelbach v. Ohio Edison Co.*, 1 F. App'x 435, 437 (6th Cir. 2001) (citing *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995)).

### III

The first question to be decided is what law governs this case. If Defendants are correct, Michigan law does not apply, and most likely, neither does the MBTFA. On the other hand, if Plaintiff is correct, Michigan law governs: the MBTFA does apply, and the next consideration is whether that act has been violated.

As has long been established, "[e]xcept in matters governed by the Federal Constitution or by acts of Congress, the law to be applied in any case is the law of the state." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Accordingly, "federal courts sitting in diversity apply state substantive law and federal procedural law." *Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 416 (1996). When a conflict of law arises during such an action, "the choice-of-law rules of the forum state" will govern. *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 391 (6th Cir. 2000). In other words, to resolve conflicts between state law, a federal court sitting in diversity applies the choice-of-law rules of the state in which the court sits. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). Here, that state is Michigan.

To resolve conflict of laws questions, "Michigan has adopted the approach set forth in the Restatement (Second) of Conflict of Laws." *Johnson v. Ventra Group, Inc.*, 191 F.3d 732, 738 (6th Cir. 1999). Pursuant to this approach, where parties agree to be governed by the law of a specific jurisdiction, that contractual choice will be binding unless either:

> (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice, or

> (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of [§] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2) (1988). The Purchase Order signed by the two parties contained a choice of law provision, establishing as follows: "This contract and performance hereunder shall be governed by the case and statutory laws of the State of Tennessee." Purchase Order Agreement 1, Defs.' Mot. Ex. C.

Plaintiff contends that this choice of law provision is irrelevant because its claims "are based on the Trust Fund Act (which does not derive from any contract) and the November Payment Agreement," not the Purchase Order. Pl.'s Resp. 11, ECF No. 23. Further, Plaintiff alleges that the November Payment Agreement, which contains no choice-of-law provision, "superseded the Purchase Order." *Id.* at 12. The arguments will be taken in the most logical order.

**A**

Plaintiff argues that, "[t]here is no question that [the] November Payment Agreement supersedes the DynaSteel Purchase Order." *Id.* In Michigan, when two agreements cover the same subject matter and include inconsistent terms, "the later agreement supersedes the earlier agreement." *CMI Intern., Inc. v. Intermet Intern. Corp.*, 649 N.W.2d 808, 812 (Mich. Ct. App. 2002) (citing *Omnicom of Michigan v. Giannetti Investment Co.*, 561 N.W.2d 138 (Mich. Ct. App. 1997)).

Plaintiff cites *Lawyers Title Ins. Corp. v. First Federal Sav. Bank & Trust*, 744 F. Supp. 778, 785 (E.D. Mich. 1990) to support its claim that the November Payment Agreement "totally supersedes" the Purchase Order. Pl.'s Resp. 12. In *Lawyers*, the court concluded,

> It has been long settled in Michigan that: "Where the parties to an existing contract enter into a new agreement, *completely covering the same subject matter*, but containing terms which are inconsistent with those of the earlier contract, so that the two cannot stand together, the effect is to supersede and rescind the earlier contract, leaving the latter agreement as the only agreement of the parties on the subject."

*Lawyers*, 744 F. Supp. at 785 (emphasis added) (quoting *Joseph v. Rottschafer*, 227 N.W. 784, 786 (1929)).  As noted, for the second agreement to supersede the original, it must address the same subject matter.

However, absent an integration or merger clause, when a second agreement does "not cover the entire transaction," that agreement should not control and supersede "the prior agreement, which does cover the entire transaction." *Nib Foods, Inc. v. Mally*, 246 N.W.2d 317, 321 (Mich. Ct. App. 1976).  In *Nib Foods*, the Michigan Court of Appeals addressed an original agreement with four separate provisions, and a second agreement which covered only two. *Id*. The court concluded that the second agreement should supersede only the portions of the first agreement that it addressed.  *Id*.  Because a covenant not to compete was contained in the parties' first agreement and not covered in the second, the court concluded that "merger is not applicable here and defendants [] are bound by the covenant contained in the [first] agreement." *Id*.

Here, the parties' first agreement — the March 19, 2009 Purchase Order — contained 14 distinct provisions, including a "Price and Payment" provision and a "Governing Law and Jurisdiction" provision.  The parties' second agreement — the November 17, 2009 Payment Agreement — involved only the payment of debts DynaSteel owed to PCI.  It does not contain any terms that are inconsistent with the Purchase Order's choice of law provision, nor does it address the law to be applied to any disputes.  Pursuant to the guidance of *Nib Foods*, the November Payment Agreement only supersedes paragraph 2 of the Purchase Order: the

provision for Price and Payment. Accordingly, as Michigan has established, the original Purchase Order's choice of law provision will remain binding so long as it comports with § 187(2) of the Restatement (Second) of Conflict of Laws.

This conclusion is reinforced by the fact that the November Payment Agreement was intended by the parties to govern DynaSteel's payment to Plaintiff for all three projects where debts remained unpaid: the Karn project, the Sammis project, and the Brandon Shores project. To conclude that the November Payment Agreement supersedes the Purchase Order for the Karn project would necessarily imply that it also supersedes the agreements for the Sammis and Brandon Shores projects. It would make little sense to conclude that a two-page payment plan now governs three different construction projects in three different states when that payment plan provides nothing about the substantive work being performed.

The next determination is whether the choice-of-law provision contained within the Purchase Order complies with § 187(2) and is therefore binding on the parties.

As to whether the chosen state of Tennessee has a substantial relationship to the parties or the transaction here, it is clear that it does. Established by Defendants and not refuted by PCI, "DynaSteel's offices were in Tennessee, PCI has an office in Tennessee, the Purchase Order was issued and signed in Tennessee, and the Individual defendants live in Tennessee." Defs.' Mot. 5. In fact, there are no ties between Michigan and any of the parties to this case except that the ductwork they created was transported to a construction site in Michigan and DynaSteel was paid by a Michigan owner. The choice of Tennessee law does not violate § 187(2)(a).

The choice of Tennessee law also does not offend the second component of § 187(2). That section provides that a contractual choice of law provision will be binding unless:

> application of the law of the chosen state would be contrary to a fundamental
> policy of a state which has a materially greater interest than the chosen state in the

> determination of the particular issue and which, under the rule of [§] 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.

Restatement (Second) of Conflict of Laws § 187(2)(b) (1988). Although application of Tennessee law would be contrary to the Michigan policy underlying the MBTFA (by not requiring that funds be held in trust and paid first to laborers or materialmen), Michigan does not have a "materially greater interest" than Tennessee in the determination of this action. The allegedly harmed party, PCI, has no connection to Michigan whatsoever. Its relationship with DynaSteel was established and maintained outside of Michigan, and the alleged mishandling of funds occurred outside of the state. While Michigan does have an interest in protecting the Michigan owner that paid DynaSteel, that interest is not "materially greater" than Tennessee's interest in protecting the corporations that do business within its borders, including the entity allegedly harmed here. Accordingly, the Tennessee choice of law provision in the Purchase Order is binding.[4]

**B**

PCI also argues that its claims are "not based on DynaSteel's Purchase Order or 'performance thereunder,'" and therefore the choice of law provision does not apply. Pl.'s Resp. 11. Although PCI is suing DynaSteel for a breach of the November 2009 Payment Agreement, that agreement was simply a modification of the payment terms of the original Purchase Order. In consideration for that Purchase Order, PCI committed to insulating the necessary ductwork before it was shipped to Michigan, and DynaSteel committed to pay PCI for the work. This

---

[4] The parties may wonder how this conclusion was reached in light of this Court's order denying Defendants' motion to transfer venue under the same provision. In that order, this Court stated that "it is unclear, based on the parties' arguments, whether the Purchase Order or the Payment Agreement is the operative document" in this case. May 5, 2012 Op. & Order 17, ECF No. 12. Upon further review, and as outlined above, this ambiguity has been remedied, and the Purchase Order does apply.

lawsuit does implicate performance under the original Purchase Order — DynaSteel's obligation to pay for PCI's work. That the timing and amount of payments was altered by a subsequent agreement does not change the fact that PCI is attempting to recover money for work it performed under the original Purchase Order. Bringing this suit under the November Payment Agreement does not invalidate the choice-of-law provision PCI originally agreed to, which remained unaltered, and is therefore binding.

PCI also claims that by entering into the November 2009 Payment Agreement, it did "not waive any of its legal remedies for non-payment contractual, statutory or otherwise should payment not be made in full by DynaSteel." November Payment Agreement ¶ 14. PCI believes this provision overrides the choice of Tennessee law and opens the door to any conceivable claim for damages, including one under the MBTFA. But this provision is limited by the previous agreement, which provided that Tennessee law would govern any dispute. So while PCI did not waive any of the available legal remedies that existed at the time the November Payment Agreement was executed, those remedies were already restricted to those under Tennessee law by application of the Purchase Order. Therefore, when PCI did not waive any of its legal remedies, it did not reclaim those it had already agreed do not apply.

C

Finally, PCI argues that whether the Purchase Order or the November Payment Agreement governs this case, the MBTFA applies because it "stands alone and is not tied to any contract." Pl.'s Resp. 13. It is therefore necessary to determine whether the MBTFA, on its own accord, reaches the situation here. Upon review, it does not.

To determine if the MBTFA should apply to this case simply because DynaSteel was paid by a Michigan owner for materials furnished on a Michigan project, it is necessary to look

at the legislators' intent for the statute. For statutory construction, courts begin "by looking at the language of the statute itself to determine if its meaning is plain. Plain meaning is examined by looking at the language and design of the statute as a whole." *United States v. Wagner*, 382 F.3d 598, 607 (6th Cir. 2004) (internal quotation marks and citation omitted).

"During the boom period in the 1920's speculative builders often undertook to construct projects too large for their available capital to finance, and they frequently paid suppliers and materialmen on older projects with funds received as payments on more current operations." *People v. Miller*, 259 N.W.2d 877, 880 (Mich. Ct. App. 1977). With the Wall Street Stock Market Crash of 1929 and the consequent widespread insolvency of many building contractors, "these pyramided empires also collapsed and many subcontractors and suppliers were never paid." *Id.* As a result, the MBTFA was passed in 1931 "as a depression-era measure to afford additional protection to subcontractors and materialmen." *Id.* "In light of this history, it is clear that the design of the act is to prevent contractors from juggling funds between unrelated projects." *Id.*

The MBTFA was originally created as a penal statute. *B.F. Farnell Co. v. Monahan*, 141 N.W.2d 58, 60–61 (Mich. 1966); *see also DiPonio Constr. Co. v. Rosati Masonry Co.*, 631 N.W.2d 59, 62 (Mich. Ct. App. 2001) (holding that the MBTFA "does not expressly provide a civil cause of action"). Specifically, section one states that building contract funds paid to a contractor represent a trust for the benefit of laborers, subcontractors, materialmen, etc. associated with the owner's project. Mich. Comp. Laws. § 570.151. Section two then states that a contractor who does not first pay laborers, subcontractors, materialmen with those funds will face criminal penalties. Mich. Comp. Laws. § 570.152.

Nevertheless, Michigan courts have recognized a civil remedy inherent in the MBTFA. *See B.F. Farnell Co.*, 141 N.W.2d at 60–61. The elements of such a claim are:

> (1) the defendant is a contractor or subcontractor engaged in the building construction industry, (2) a person paid the contractor or subcontractor for labor or materials provided on a construction project, (3) the defendant retained or used those funds, or any part of those funds, (4) for any purpose other than to first pay laborers, subcontractors, and materialmen, (5) who were engaged by the defendant to perform labor or furnish material for the specific project.

*DiPonio Constr. Co.*, 631 N.W.2d at 62. It is clear that no element in a plaintiff's prima facie civil claim explicitly requires an event or party to be affiliated with Michigan. *Accu-Tech Corp. v. Jackson*, 352 F. Supp. 2d 831, 836 (E.D. Mich. 2005).

> Thus, by the strictest of readings, a violation occurs when a (1) non-Michigan contractor (2) paid by a non-Michigan party for a non-Michigan project (3) retains the funds outside of the state, (4) for a purpose other than to first pay non-Michigan laborers, subcontractors, or materialmen (5) whose relationship with the defendant was forged outside of Michigan to provide labor or materials for the project.

*Id.* The court in *Accu-Tech* went on to note that "[c]learly, however, the MBTFA does not (and could not) reach this far. The Michigan legislature must have intended some connection to the state." *Id.*

The *Accu-Tech* court established that "the focal point of the [MBTFA] is the mishandling of construction funds," and concluded that funds being mishandled in Michigan held significant weight for purposes of whether the act applied. *Id.* at 837. Further, the court held that "[t]he location of the project is not relevant, however, to the conduct regulated by the MBTFA — the focus of the statute is on the collection and misuse of construction funds and not, for instance, on construction site safety." *Id.*

The court then concluded that the MBTFA applied there, emphasizing the fact that "the funds were collected and possibly mishandled in Michigan by a Michigan entity" and that "only

- 12 -

two things are not associated with the state. [Plaintiff] is a Georgia corporation . . . [and] the projects were not located in Michigan." But both of these concerns were mitigated significantly. Noted above, the fact that the project was not located in Michigan is irrelevant. In addition, the Georgia-based plaintiff was "operating in Michigan and is therefore entitled to the protections of the state." *Id*.

Following the guidance of *Accu-Tech*, the MBTFA does not apply on its own accord here. Unlike that situation, there are only two connections between the parties and their transactions and the state of Michigan: DynaSteel was paid by a Michigan owner and the project was located in Michigan. As discussed above, the location of the project does not matter. Therefore, the only connection to Michigan is the location of the owner that paid DynaSteel.

All of the other factors advise against the application of the MBTFA. The alleged mishandling of funds — the primary concern of the act — occurred exclusively outside the state of Michigan. PCI did not conduct business in Michigan, and is therefore not necessarily "entitled to the protections of the state." DynaSteel did not conduct business in the state of Michigan except to send materials to a Michigan construction site, materials that were fabricated in Tennessee and Mississippi. The relationship between DynaSteel and PCI was forged in Kansas, Tennessee, and Mississippi; not in Michigan. As noted, the "Michigan legislature must have intended some connection to the state," and the fact that the owner was a Michigan entity, when no other ties can be found, is not enough for the application of the MBTFA.

It follows that the parties to this action are bound by Tennessee law as provided by the Purchase Order, and that the MBTFA does not apply on its own accord. Therefore, there is no need to assess whether the act has been violated.

## IV

Accordingly, it is **ORDERED** that Defendants' motion for partial summary judgment, ECF No. 20, is **GRANTED**.

It is further **ORDERED** that Plaintiff's motion for partial summary judgment, ECF No. 33, is **DENIED**.

It is further **ORDERED** that Count I of Plaintiff's amended complaint (violation of MBTFA) is **DISMISSED** with prejudice.

Dated: February 19, 2013                         s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 19, 2013.

                    s/Tracy A. Jacobs
                    TRACY A. JACOBS